**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. <u>1:19-cv-01380</u>

JACK WINTER, Derivatively on Behalf of Nominal
Defendant, FARMLAND PARTNERS INC.,

     Plaintiff,

  v.

PAUL A. PITTMAN, LUCA FABBRI, ROBERT
COWAN, JAY B. BARTELS, CHRIS A.
DOWNEY, JOHN A. GOOD, JOSEPH W.
GLAUBER, D. DIXON BOARDMAN, JOHN C.
CONRAD, DARELL D. SARFF, and THOMAS
S.T. GIMBEL,

     Defendants,

  and

FARMLAND PARTNERS INC.,

     Nominal Defendant.

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

  Plaintiff Jack Winter ("Plaintiff"), by and through his undersigned attorneys, submits

this Verified Shareholder Derivative Complaint (the "Complaint") against defendants named

herein. Plaintiff alleges the following based upon information and belief, except as to those

allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's

information and belief is based upon, among other things, the investigation conducted by and under

the supervision of his counsel which included, among other things: (a) a review and analysis of

regulatory filings filed by Farmland Partners Inc. (collectively with its subsidiaries, "Farmland

Partners" or the "Company") with the United States Securities and Exchange Commission ("SEC"); (b) a review and analysis of press releases and media reports issued and disseminated by Farmland Partners; (c) a review of other publicly available information concerning Farmland Partners, including articles in the news media and analyst reports; (d) complaints and related materials in litigation commenced against, or on behalf of, some or all of the Individual Defendants (defined below) and/or the Company; and (e) applicable rules and regulations.

## SUMMARY OF THE ACTION

1.      This is a shareholder's derivative action brought for the benefit of Nominal Defendant Farmland Partners and is brought against certain current and former members of the Company's Board of Directors (the "Board") and certain of its current and former executive officers (collectively, the "Individual Defendants") seeking to remedy the Individual Defendants' violations of state law and breaches of fiduciary duty from at least March 16, 2016 through the present (the "Relevant Period").

2.      Farmland Partners is a real estate company that owns and seeks to acquire farmland located throughout North America and makes loans to farmers secured by farm real estate. Farmland Partners is a Maryland corporation and is headquartered in Denver, Colorado.

3.      The Company has elected to be taxed as a real estate investment company ("REIT"), meaning that it is required to earn at least 75% of its income from rental properties or investments in real estate and must pay out at least 90% of its taxable income as unqualified dividends to investors. Because of the strong dividend income REITs provide, they are an important investment vehicle for retirees and others who require a continuing income stream to meet their living expenses. Perhaps the biggest difference between corporations and REITs is that

REITs retain very little earnings and cash flow to use for growth projects. Thus, in order to grow they raise external debt and equity capital from investors. This explains why REITs almost always have rising share counts over time.

4.      On July 11, 2018, a report was published under the pseudonym *Rota Fortunae* (the "*Rota Fortunae* Report"), alleging, among other things, that Farmland Partners artificially increased revenues by making loans to tenants who would then use the cash to pay rent. Moreover, the *Rota Fortunae* Report notes that Farmland Partners has failed to disclose that a majority of the loans made as part of the Company's lending program (the "Loan Program") have been made to two individuals, Jesse Hough ("Hough") and Ryan Niebur ("Niebur") (both of whom were previously associated with the Company), and that the loans made to these two individuals are not arm's-length transactions. Furthermore, as detailed in the *Rota Fortunae* Report, the Company has failed to disclose that in January 2018, Niebur, a debtor and tenant of the Company, filed for bankruptcy on behalf of himself and his wife, and separately, on behalf of his farming business. The bankruptcies were brought under Chapter 12 and were jointly administered. The proposed reorganization submitted by Niebur and his wife included an assumption of the Company's farmland leases and an assignment to another entity controlled by Niebur. Although the Company announced in a press release on July 17, 2018, that the "loans made to Ryan Niebur are good loans and will perform well for the Company," less than two months before on May 24, 2018, the Company objected to the assumption and assignment of the leases based in part on its assertion that the debtors (i.e., the Nieburs and Niebur's company) failed to demonstrate they would be able to make the payments under the proposed reorganization plan. To date, the Company has made no disclosure whatsoever concerning Niebur's personal or business bankruptcies. Nor has the

Company ever fully disclosed material information regarding the Loan Program, including all of the identities of the individuals and businesses who have received loans and the terms of such loans.

5.      Indeed, on July 18, 2018, in another article in *Seeking Alpha* entitled *Farmland Partners: The Smell Test* from an entirely different author calling himself/herself, "Beyond Saving", the Company was criticized for failing to disclose the Niebur bankruptcy in connection with the Loan Program regardless of its magnitude stating: "even if the amounts at risk are minimal and the risk of either the leases or the loans being modified are slim, a bankruptcy is something that should be disclosed. … [M]ost REITs do disclose tenant bankruptcies even when they are not expected to impact rent."

6.      As a result of the revelations over the Company's Loan Program and other issues raised in the *Rota Fortunae* Report, the price of the Company's common stock fell $3.87 per share, or 38.96%, to close at $5.28 per share on July 11, 2018, and the price of Farmland Partners' Series B preferred stock fell $6.08 per share, or 24.75%, to close at $18.49 per share on July 11, 2018.

7.      Further, the first of two securities class actions was filed in the United States District Court for the District of Colorado on July 11, 2018, *Kachmar v. Farmland Partners Inc., et al.*, Case No. 1:18-cv-01771 (D. Colo.) (the "*Kachmar* Action"), alleging violations of the federal securities laws against the Company and defendants Paul A. Pittman ("Pittman"), the Company's Chief Executive Officer ("CEO") and Luca Fabbri ("Fabbri"), Farmland Partners' Chief Financial Officer ("CFO").[1]

---

[1] A second securities class action was filed on August 17, 2018, *Mariconda v. Farmland Partners Inc., et al.*, Case No. 1:18-cv-02104 (D. Colo. Aug. 17, 2018) (the "*Mariconda* Action") (collectively, with the *Kachmar* Action, the "Securities Class Actions"). The *Kachmar* Action was

8.   In response to the *Rota Fortunae* Report, on July 24, 2018, the Company initiated a lawsuit against the author alleging defamation and other causes of action.[2]

9.   On August 8, 2018, the Company released its earnings and then held an earnings conference call on August 9, 2018.   On the call, Defendant Pittman announced that: (i) the Company would be substantially cutting its quarterly dividend for the 2018 third quarter to $0.05 per share of common stock, a decrease of more than 50% from the prior quarter dividend of $0.1275 per share of common stock; (ii) the Company was lowering its 2018 earnings guidance $0.10 per share to a range of $0.30-0.34 per share from the prior range of $0.40-0.44 per share; (iii) the Board authorized an additional $30 million of buybacks of the Company's common stock and Series B Perpetual Preferred Stock; and (iv) the Company would be financing the share buyback, in part, by disposing of its properties and the cutting of the dividend. In other words, instead of growing the real estate portfolio, Defendant Pittman blamed the Company's lackluster performance and cut in its dividend on the *Rota Fortunae* Report.

10.   On August 13, 2018, *Seeking Alpha* published another article authored by "Beyond Saving" entitled *Farmland Partners: Opacity*.   The article challenged Defendant Pittman's blaming the *Rota Fortunae* Report for the reduced revenue guidance on the August 9, 2018 earnings conference call and opined that the Company was not performing well, and the dividend would eventually have to be cut anyway. The article's real criticism was focused on "opacity" and

---

voluntarily dismissed without prejudice on November 13, 2018. The *Mariconda* Action is going forward and lead plaintiff was appointed and their selection of lead counsel approved by the court on December 3, 2018. (*Mariconda* Action ECF No. 39).

[2] *Farmland Partners Inc. v. Fortunae*, Case No. 1:18-cv-02351 (D. Colo. Sept 14, 2018).

that Farmers Partners has "poor transparency on numbers that are important to investors." Beyond Standing stated:

> Basic things like leasing spreads, acquisition cap rates and tenant defaults have inadequate disclosures. Rota Fortunae demonstrated how applying a story to small pieces of factual information can lead to a very negative result. If [Farmers Partners] had been more transparent up front, Rota's allegations likely would have had much less impact. The only thing the market hates more than bad news is the unknown.[3]

11.     During 2017 and the beginning of 2018, the Company performed buybacks, whereby the Company repurchased its outstanding common stock at prices that were artificially inflated.  The Company repurchased approximately $10 million of the Company's common stock during 2017 at an average price of $8.93 per share.  The Company also repurchased approximately $6.5 million worth of the Company's common stock at an average purchase price of approximately $8.33 per share during the first quarter of 2018.  These buybacks were performed at prices that were significantly more than the closing price of the Company's common stock on July 11, 2018 of $5.18 per share following the release of the *Rota Fortunae* Report.  On April 25, 2019, Farmland Partners common stock closed at $6.28 per share.

12.     On November 6, 2018, the Company held another earnings conference call in connection with its 2018 third quarter results. During the call, Defendant Pittman reported that since July 1, 2018, the Company had bought back a little over 1.65 million shares of Company common stock, representing about 4.4% of the outstanding shares as of July 1, 2018. Further,

---

[3] According to *Seeking Alpha*, the author, Beyond Saving, has been a contributor since 2016 with 184 articles. The author is a self-described professional in commercial real estate with an investment focus on REITs. Beyond Saving's goal is to provide detailed research on the properties being acquired and sold by the REITs, as the quality and value of the real estate purchased by a REIT has an impact on the long-term health of a REIT. It should be noted that Beyond Saving reportedly held no position in the Company's stock at the time of the articles.

Pittman and the Board's stated reason for the buyback was to create greater shareholder value in the form of a higher price per share and to also, punish the short sellers. That has not occurred. While the Company short changes REIT investors, whose main concern is a steady and/or growing income stream, with an approximately 60% dividend cut, Farmers Partners' stock price is currently languishing in the $6.00 per share range, exactly where it landed after the issuance of the *Rota Fortunae* Report. Finally, demand is futile in this case as there does not exist a majority of Board members capable of disinterestedly and independently considering a demand.

13.     The Individual Defendants breached their duties of loyalty, care, candor and good faith by: (i) allowing for materially inadequate controls over the Company's policies and practices with respect to reporting and disclosure; (ii) allowing the Company to file false and misleading periodic reports and other filings with the SEC; (iii) allowing the Company to fail to disclose pertinent, material, and important information in a timely manner; (iv) failing to take appropriate remedial action when the Board knew, or should have known, that the Company was entering into non-arm's-length loans; (v) mismanaging corporate assets by providing loans to Niebur who subsequently filed for bankruptcy; (vi) mismanaging corporate assets by bringing a lawsuit in response to the *Rota Fortunae* Report; (vii) managing the Company in a manner not aligned with shareholders' interests; and (viii) causing substantial damage to the Company's credibility, corporate image, and goodwill.

## JURISDICTION AND VENUE

14.     This Court has jurisdiction over each defendant named herein.

15.     This Court has jurisdiction over the subjection matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

16.     Farmland Partners is a corporation that conducts business and maintains its executive headquarters in this District.  The Individual Defendants have sufficient minimum contacts with Colorado so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

17.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b).  Venue is proper in this Court because a substantial portion of the transactions and wrongs complained of herein occurred in this District.

## PARTIES

18.     Plaintiff Jack Winter is currently and has continuously been a stockholder of Farmland Partners beginning prior to the Relevant Period.  Plaintiff is a citizen of Illinois.

19.     Nominal Defendant Farmland Partners is incorporated under the laws of the State of Maryland and maintains its headquarters at 4600 South Syracuse Street, Suite 1450, Denver, Colorado.  Farmland Partners' common stock is listed and traded on the New York Stock Exchange ("NYSE") under the ticker "FPI."  Farmland Partners' Series B preferred stock trades on the NYSE under the ticker symbol "FPI.B".  As of March 8, 2019, the Company had 31,899,291 shares of the Company's common stock outstanding.

*Paul A. Pittman*

20.     Defendant Pittman has been the Chief Executive Officer ("CEO") and Executive Chairman since the Company's initial public offering ("IPO") on April 16, 2014.

21.     In 2018, Pittman received $1,100,465 in total compensation from the Company.  This included $477,000 in salary, $588,997 in stock awards in the form of restricted Common Stock that vests ratably over three years, and $23,468 in all other compensation.  In 2017, Pittman

received $1,125,367 in total compensation from the Company. This included $477,000 in salary, $599,997 in stock awards in the form of restricted Common Stock that vests ratably over three years, and $48,370 in all other compensation. In 2016, Pittman received $1,676,209 in total compensation from the Company. This included $477,000 in salary, $648,852 in stock awards in the form of restricted common stock that vests ratably over three years, a $500,000 cash bonus, and $50,357 in all other compensation.

22.     As of March 19, 2019, Pittman beneficially owned 2,179,534 shares of the Company's common stock representing 7.39% of all outstanding common stock.

23.     The Company's Schedule 14A Definitive Proxy Statement filed with the SEC on March 21, 2019 ("2019 Proxy Statement") stated the following about Defendant Pittman:

> Mr. Pittman has served as our Executive Chairman and Chief Executive Officer since the formation of our company and assumed the additional role of President upon the resignation of Robert Cowan effective May 31, 2018. He also served as our President from the formation of our company until February 2017. From 2008 to 2015, Mr. Pittman served as the President of American Agriculture Corporation and Pittman Hough Farms LLC. Mr. Pittman served as the Chief Administrative Officer and Executive Vice President of Jazz Technologies, Inc., a semiconductor foundry, from March 2007 to September 2008 and its Chief Financial Officer from February 2007 to September 2008. Mr. Pittman also served as the Principal Accounting Officer of Jazz Technologies, Inc. From December 2004 to March 2006, he served as Partner and Head of Mergers & Acquisitions at ThinkEquity Partners LLC. From April 2000 to January 2003, he served as the President, Chief Executive Officer and Chief Operating Officer of HomeSphere, Inc., an enterprise software company, and TheJobsite.com, which merged into HomeSphere. Before TheJobsite.com, he worked in senior investment banking roles for ten years at Merrill Lynch & Co., and prior to that with Wasserstein Perella Co. From March 1997 to February 2000, he served as Head of Emerging Markets M&A at Merrill Lynch in London, where he was responsible for origination and execution of all M&A business in the region (Eastern Europe, the Middle East, the Former Soviet Union and Africa). Prior to Merrill Lynch & Co., he served as Director of M&A at Wasserstein Perella & Co. in New York and London. Mr. Pittman began his career at Sullivan & Cromwell as an Associate in Mergers and Acquisitions. He has been involved with the residential construction industry for more than 20 years as both a developer and builder and has also served as the general contractor and developer

of several condominium and custom home projects. He served as a Director of HomeSphere, Inc., and TheJobsite.com from April 2000 to January 2003. Mr. Pittman graduated from the University of Illinois with a B.S. degree in Agriculture, received a Masters in Public Policy from Harvard University, and a J.D. with Honors from the University of Chicago Law School.

Based on his knowledge of the Company, its business and properties, his past public company experience, his background in finance and his experience in the real estate industry, including acquiring and managing farmland, we have determined that Mr. Pittman should serve as the Executive Chairman of the Board.

24.     Upon information and belief, Defendant Pittman is a citizen of Colorado.

*Luca Fabbri*

25.     Defendant Fabbri has been the Company's Chief Financial Officer ("CFO") and Treasurer since the Company's IPO on April 16, 2014.

26.     In 2018, Fabbri received $653,184 in total compensation from the Company. This included $275,000 in salary, $249,999 in stock awards in the form of restricted Common Stock that vests ratably over three years, a $122,472 cash bonus and $5,713 in all other compensation. In 2017, Fabbri received $539,616 in total compensation from the Company. This included $275,000 in salary, $249,999 in stock awards in the form of restricted Common Stock that vests ratably over three years, and $14,616 in all other compensation. In 2016, Fabbri received $695,411 in total compensation from the Company. This included $275,000 in salary, $149,733 in stock awards in the form of restricted common stock that vests ratably over three years, a $250,000 cash bonus, and $20,678 in all other compensation.

27.     As of March 19, 2019, Fabbri beneficially owned 161,322 shares of the Company's common stock.

28.     The Company's 2019 Proxy Statement stated the following about Defendant Fabbri:

Mr. Fabbri has served as our Chief Financial Officer and Treasurer since the founding of our company. From November 2011 until 2014, Mr. Fabbri served as the Senior Vice President and Chief Operating Officer of American Agriculture. Mr. Fabbri was a founder of Co3 Systems Inc., an enterprise software company in Cambridge, MA, and served as its Vice President of Engineering from January 2010 to October 2011. From January 2003 to September 2012, Mr. Fabbri was a consultant with Elk Creek Ventures Inc., providing consulting services in technology, finance and corporate development. From April 2000 to December 2002, Mr. Fabbri served as Head of Corporate Development for Jazz Technologies, Inc. Mr. Fabbri also founded Thejobsite.com, a software company, and served as its Senior Vice President and Chief Financial Officer from April 2000 to December 2002. From August 1997 to January 2000, Mr. Fabbri was an Associate in mergers and acquisitions in the London office of Merrill Lynch & Co. Mr. Fabbri began his career in Italy as a technology and operations consultant. Mr. Fabbri has a B.S. with Honors in Economics from the University of Naples (Italy) and a M.B.A. in Finance from the Massachusetts Institute of Technology.

29.     Upon information and belief, Defendant Fabbri is a citizen of Colorado.

**Robert Cowan**

30.     Defendant Robert Cowan ("Cowan") was the Company's President from February 2017 until May 2018.  Cowan was the President of American Farmland Company ("AFCO") prior to AFCO's merger with Farmland Partners.

31.     In 2017, Cowan received $498,523 in total compensation from the Company.  This included $300,000 in salary, a $165,000 cash bonus, and $33,523 in all other compensation.

32.     The Company's Schedule 14A Definitive Proxy Statement filed with the SEC on March 21, 2018 ("2018 Proxy Statement") stated the following about Defendant Cowan:

Mr. Cowan has served as our President since the closing of our merger with AFCO on February 2, 2017. Prior to his appointment as our President, Mr. Cowan served as AFCO's President and Chief Investment Officer from December 2014. He served as the Agriculture and Timber Director for the Utah Retirement System, or URS, which administers pensions and defined contribution benefits for state, local government and public education employees in the State of Utah from February 2014 to December 2014. Before moving to URS, he worked in various roles at Farmland Reserve, Inc., a large private agricultural investment portfolio, starting in 1980, most recently as Assistant Vice President from 2009 to 2014. Mr. Cowan

obtained his Bachelor's Degree from Brigham Young University in 1974, and a Master of Science, specializing in Agricultural Economics, from Brigham Young University in 1977. Mr. Cowan has 30 years of experience in farmland property analysis, investment, acquisition and management.

33.     Upon information and belief, Defendant Cowan is a citizen of Colorado.

*Jay B. Bartels*

34.     Defendant Jay B. Bartels ("Bartels") has served as a Director of the Company since the Company's IPO on April 16, 2014. Bartels is the Chairman of the Nominating and Corporate Governance Committee and is also a member of the Audit Committee.

35.     In 2018, Bartels received $41,710 in total compensation. This included $41,000 in cash and $710 in all other compensation. In 2017, Bartels received $80,551 in total compensation from the Company. This included $31,750 in cash, $46,756 in stock awards in the form of restricted stock, and $2,045 in all other compensation. In 2016, Bartels received $45,320 in total compensation from the Company. This included $44,500 in cash and $820 in all other compensation.

36.     As of March 19, 2019, Bartels beneficially owned 4,619 shares of the Company's common stock.

37.     The Company's 2019 Proxy Statement stated the following about Defendant Bartels:

Mr. Bartels has served as a director since our initial public offering on April 16, 2014. Since 2010, Mr. Bartels has served as the Chief Executive Officer and President and a member of the board of directors of Trendmojo, Inc., a technology development company, and as the President and a member of the board of directors of Bonsai Development Corp, a California-based software company. In addition, since 2005, he has served as a partner and a member of the board of directors of Germinator, Inc., a California-based seed fund that advises and invests in early-stage technology companies. Mr. Bartels also has served as a member of the board of directors of ProWebSurfer, Inc., which focuses on new media and online advertising, since 2006. From 2008 to 2012, Mr. Bartels was the Chief Operating Officer of CollabRx, a privately held company that focuses on healthcare data

12

research. Mr. Bartels holds a B.S. in Mathematics and Statistics from the University of California at Berkeley.

Based on his extensive experience as an investor, advisor and manager of a variety of businesses and his demonstrated leadership abilities, strong knowledge of our business and financial expertise, we have determined that Mr. Bartels should serve as a director.

38.     Upon information and belief, Defendant Bartels is a citizen of California.

**Chris A. Downey**

39.     Defendant Chris A. Downey ("Downey") has served as a Director of the Company since the Company's IPO on April 16, 2014.  Downey is the Chairman of the Audit Committee and also a member of the Compensation Committee.

40.     In 2018, Downey received $54,710 in total compensation from the Company.  This included $54,000 in cash and $710 in all other compensation.  In 2017, Downey received $90,060 in total compensation from the Company.  This included $41,250 in cash, $46,765 in stock awards in the form of restricted stock, and $2,045 in all other compensation.  In 2016, Downey received $58,320 in total compensation from the Company.  This included $57,500 in cash and $820 in all other compensation.

41.     As of March 19, 2019, Downey beneficially owned 73,907 shares of the Company's common stock.  As of March 16, 2018, Downey beneficially owned 7,386 shares of the Company's common stock.[4]  As of March 20, 2017, Downey beneficially owned 49,799 shares of the Company's common stock.

---

[4] According to the chart located in the Company's 2018 Proxy Statement.  The Proxy Statement also contains a footnote stating that Downey's share ownership includes 46,231 shares held by a trust of which Downey and his spouse are the sole trustees and beneficiaries.

42.    The Company's 2019 Proxy Statement stated the following about Defendant Downey:

> Mr. Downey has served as a director since our initial public offering on April 16, 2014. Mr. Downey has over 30 years of experience in land development, financial management and management consulting. Since 1998, Mr. Downey has been a principal at Stirling Development, a real estate development company he co-founded. Mr. Downey previously worked for a private real estate company and directed several large-scale master planned community development projects from acquisition through zoning, entitlement, financing, infrastructure and build-out. Mr. Downey is a former CPA and previously was a management consultant with Arthur Young & Company, where he directed the firm's financial planning and controls practice in Orange County, California. Mr. Downey also worked in the medical device operations of Fiat S.p.A. in California and Italy in both line and staff positions. Mr. Downey holds a B.A. degree in Chemistry from the University of California at Irvine, and an M.B.A. from the Anderson School of Management at the University of California at Los Angeles.
>
> Based on his demonstrated leadership abilities, extensive experience in the real estate industry and his finance and accounting expertise, we have determined that Mr. Downey should serve as a director.

43.    Upon information and belief, Defendant Downey is a citizen of California.

### Joseph W. Glauber

44.    Defendant Joseph W. Glauber ("Glauber") has served as a Director of the Company since February 2015.  Glauber is a member of the Audit Committee, Compensation Committee, and Nominating and Corporate Governance Committee.

45.    In 2018, Glauber received $40,460 in total compensation from the Company.  This included $39,750 in cash and $710 in all other compensation.  In 2017, Glauber received $78,810 in total compensation from the Company.  This included $30,000 in cash, $46,765 in stock awards in the form of restricted stock, and $2,045 in all other compensation.  In 2016, Glauber received $41,229 in total compensation from the Company.  This included $40,000 in cash and $1,229 in all other compensation.

46.    As of March 19, 2019, Glauber beneficially owned 11,259 shares of the Company's common stock.

47.    The Company's 2019 Proxy Statement stated the following about Defendant Glauber:

> Dr. Glauber has served as a director since February 2015. Dr. Glauber served as the Chief Economist of the U.S. Department of Agriculture (the "USDA") from 2008 to 2014 and as Deputy Chief Economist of the USDA from 1992 to 2007. Dr. Glauber has been active in the agriculture industry since the early 1980s and began working for the USDA in 1984. In addition, Dr. Glauber chaired the Federal Crop Insurance Corporation Board of Directors from 2008 to 2014, served as the chief U.S. agricultural negotiator in the WTO Doha Round from 2007 to 2009 and served on the President's Council of Economic Advisors from 1991 to 1992. Dr. Glauber is currently a senior research fellow at the International Food Policy Research Institute and, over the course of his career, has written numerous articles about the agricultural industry that have been published in academic and trade journals. Dr. Glauber received an A.B. in Anthropology from the University of Chicago and a Ph.D. in Agricultural Economics from the University of Wisconsin.
>
> Based on his extensive knowledge of agricultural economics and the agricultural industry as a whole, we have determined that Dr. Glauber should serve as a director.

48.    Upon information and belief, Defendant Glauber is a citizen of Virginia.

### John A. Good

49.    Defendant John A. Good ("Good") has served as a Director of the Company since January 2018.  Good is the Chairman of the Compensation Committee and also a member of the Nominating and Corporate Governance Committee.

50.    In 2018, Good received $50,469 in total compensation from the Company.  This included $29,000 in cash, $20,832 in stock awards and $637 in all other compensation.

51.    As of March 19, 2019, Good beneficially owned 11,733 shares of the Company's common stock.

52.    The Company's 2019 Proxy Statement stated the following about Defendant Good:

Mr. Good has served as a director since his appointment to the Board on January 21, 2018. Since October 2018, Mr. Good has served as the Chief Executive Officer of Jernigan Capital, Inc., a NYSE-listed REIT that provides capital to developers of self-storage facilities. Prior to serving as Chief Executive Officer, Mr. Good served as the Company's President and Chief Operating Officer and as a director since June 2015. Prior to joining Jernigan Capital, Inc., Mr. Good was a partner and co-head of the REIT practice group of Morrison & Foerster LLP., a global law firm. From 1999 to 2013, Mr. Good was a partner, multi-term executive committee member and head of the REIT practice at the law firm of Bass, Berry & Sims PLC and prior to that was a stockholder and chair of the securities and M&A practice group at the law firm of Baker, Donelson, Bearman, Caldwell and Berkowitz P.C. Mr. Good has over 28 years' experience working with senior management teams and boards of directors of public companies in the REIT and financial services industries on corporate finance, corporate governance, merger and acquisition, tax, executive compensation, joint venture and strategic planning projects. As a nationally recognized corporate and securities lawyer, he was lead counsel on over 200 securities offerings raising in excess of $25 billion over the past 25 years, with more than 125 of those deals being in the REIT industry. Mr. Good graduated from the University of Memphis with a B.B.A. in accounting, cum laude, in 1980, attained his CPA designation and practiced with a large regional CPA firm until entering University of Memphis School of Law, where he received his J.D with honors in 1987. He has been nationally ranked by Chambers USA as a leading lawyer to the REIT industry and has been active in NAREIT since 1994.

Based on his extensive experience working with public companies in the REIT industry, we have determined that Mr. Good should serve as a director.

53.     Upon information and belief, Defendant Good is a citizen of Tennessee.

### D. Dixon Boardman

54.     Defendant D. Dixon Boardman ("Boardman") served as a Director of the Company from February 2, 2017 until his resignation on December 5, 2017. Boardman was the former Chairman of the Board of AFCO prior to the merger with Farmland Partners.

55.     In 2017, Boardman received $42,380 in total compensation from the Company. This included $27,000 in cash, $15,024 in stock awards in the form of restricted stock, and $356 in all other compensation.

56.     The Company's Schedule 14A Definitive Proxy Statement filed with the SEC on

March 23, 2017 ("2017 Proxy Statement") stated the following about Defendant Boardman:

> Mr. Boardman has served as a director since the closing of our merger with AFCO
> on February 2, 2017. Mr. Boardman served as the Chairman of the board of
> directors of AFCO from AFCO's inception in 2009 until the closing of the merger.
> Mr. Boardman is the founder and Chief Executive Officer of Optima Fund
> Management LLC, a multi-disciplined hedge fund management firm that is SEC-
> registered and has assets under management of $2.9 billion, having launched its
> flagship fund in 1988. Prior to forming Optima Fund Management LLC, Mr.
> Boardman advised high net worth individuals at UBS PaineWebber, a global
> financial services firm, as a member of the Chairman's Council and earlier as a
> Senior Vice President at Kidder, Peabody, a U.S.-based securities firm. In addition,
> Mr. Boardman has served as Chairman of the Special Projects Committee of
> Memorial Sloan Kettering Cancer Center and is currently a member of the
> President's Council of Memorial Sloan Kettering Cancer Center. He is also a
> member of the Executive Committee of New York Presbyterian-Weill Cornell
> Council. Mr. Boardman is also a director of Florida Crystals Corporation and a
> director of Kadmon Corporation, and is an Advisory Board director of J. C.
> Bamford Excavators Limited.
>
> Based on his familiarity with the farms acquired in the AFCO transaction, extensive
> experience in the real estate industry, his finance expertise and his past public
> company experience, we have determined that Mr. Boardman should serve as a
> director.

57.     Upon information and belief, Defendant Boardman is a citizen of New York.

**John C. Conrad**

58.     Defendant John C. Conrad ("Conrad") served as a Director of the Company from

March 2016 until his resignation on August 28, 2017.

59.     In 2017, Conrad received $58,962 in total compensation from the Company.  This

included $27,000 in cash, $30,889 in stock awards in the form of restricted stock, and $1,073 in

all other compensation.  In 2016, Conrad received $40,736 in total compensation.  This included

$28,500 in cash, $11,963 in stock awards in the form of restricted stock, and $273 in all other

compensation.

60.    The Company's 2017 Proxy Statement stated the following about Defendant Conrad:

> Mr. Conrad has served a director since March 2016. Mr. Conrad currently engages in consulting services for a major US bank group for recapture of distressed assets. Since 2005, Mr. Conrad has been a principal at JB Consumer Products Group, LLC, a company that Mr. Conrad started to import graphite products into the United States. Since 2007, Mr. Conrad has served as a partner of JB Green Environmental Group, a company engaged in construction projects in Mongolia. Additionally, since 2013, Mr. Conrad has served as the Managing Partner of Global Consulting & Development LLC, a dairy health organization. Pursuant to the Security Holders Agreement, dated as of March 2, 2016, by and among the Company and each of the sellers of the Forsythe farms (the "Security Holders Agreement"), Mr. Conrad was designated to serve on the Board by Gerald R. Forsythe.

> Based on his experience as an advisor and manager of multiple businesses, we have determined that Mr. Conrad should serve as a director.

61.    Upon information and belief, Defendant Conrad is a citizen of New Jersey.

### Darell D. Sarff

62.    Defendant Darell D. Sarff ("Sarff") served as a Director from April 16, 2015 until his resignation on January 18, 2018.

63.    In 2017, Sarff received $82,060 in total compensation from the Company.  This included $33,250 in cash, $46,765 in stock awards in the form of restricted stock, and $2,045 in all other compensation.  In 2016, Sarff received $45,070 in total compensation from the Company. This included $44,250 in cash and $820 in all other compensation.

64.    The Company's 2017 Proxy Statement stated the following about Defendant Sarff:

> Mr. Sarff has served as a director since our initial public offering on April 16, 2014. Mr. Sarff has been the owner and operator of a diversified grain and vegetable farm in Mason County, Illinois since 1970. Mr. Sarff served as Chairman of the State Committee of Farm Service Agency of the State of Illinois from 2009 to 2014. During that time he oversaw the USDA's Federal Farm Service Agency programs for the State of Illinois. In addition, since 1996, Mr. Sarff has been an owner and

managing broker of Kennedy-Sarff Real Estate, LLC and Prairieland Gold Real Estate, in Havana, Illinois. From 1997 until 2013, Mr. Sarff also served as director of Pro-Fac Cooperative Inc., which was a publicly traded agricultural cooperative located in Rochester, New York, that supplied fruits, vegetables and popcorn to food processors. Mr. Sarff also served on the board of directors of the Illinois Farm Bureau from 1986 to 1996. Mr. Sarff holds an associate's degree in agriculture from Illinois Central College.

Based on his experience in executive roles, including his service as a director on a publicly traded agricultural cooperative, and his extensive experience in agricultural real estate and farming operations, we have determined that Mr. Sarff should serve as a director.

65.     Upon information and belief, Defendant Sarff is a citizen of Chandlerville, Illinois.

***Thomas S.T. Gimbel***

66.     Defendant Thomas S.T. Gimbel ("Gimbel") served as a Director of the Company from February 2, 2017 and notified the Company on March 19, 2018 that he would not stand for reelection when his term expires following the annual meeting that was held on May 2, 2018. Gimbel is no longer a member of the Board.

67.     In 2017, Gimbel received $42,380 in total compensation from the Company.  This included $27,000 in cash, $15,024 in stock awards in the form of restricted stock, and $356 in all other compensation.

68.     The Company's 2018 Proxy Statement stated the following about Defendant Gimbel:

Mr. Gimbel has served as a director since the closing of our merger with AFCO on February 2, 2017. Mr. Gimbel served as AFCO's Chief Executive Officer from the completion of AFCO's initial public offering until the closing of the merger. He also served as Vice President and a director of AFCO from AFCO's inception in 2009 until the closing of the merger. Mr. Gimbel is Executive Managing Director of Optima Fund Management LLC, a multi-disciplined hedge fund management firm that is SEC-registered and has assets under management of $2.9 billion, which he joined in 2004. Prior to joining Optima Fund Management LLC, Mr. Gimbel was Managing Director for Hedge Fund Investments at Credit Suisse Asset

19

Management, LLC, an investment management firm. Prior to joining Credit Suisse, Mr. Gimbel was head of the Hedge Fund Department at Donaldson, Lufkin & Jenrette, which provided investment banking and security brokerage services prior to being acquired by Credit Suisse. Earlier in his career, Mr. Gimbel was Vice President and Treasurer of Smith Barney's real estate acquisition and syndication subsidiary. He is also a member of the board of directors and Investment Committee of Lighthouse Guild, the Board of Overseers of Children's Hospital in Boston and a director of Prime Energy Corporation. Mr. Gimbel has a B.A. in economics from Bowdoin College and an M.B.A. in finance from Columbia Business School.

Based on his familiarity with the farms acquired in the AFCO transaction, extensive experience in the real estate industry, his finance expertise and his past public company experience, we have determined that Mr. Gimbel should serve as a director.

69.     Gimbel and AFCO entered into a separation agreement, which entitled him to a separation payment from AFCO following his termination in connection with a change in control. Farmland Partners assumed the separation agreement following its merger with AFCO on February 2, 2017.  As a result, Farmland Partners paid a $2,857,951 separation payment to Gimbel.

70.     Upon information and belief, Defendant Gimbel is a citizen of New York.

71.     Defendants Downey, Bartels and Glauber are sometimes collectively referred to herein as the "Audit Committee Defendants."

72.     Defendants Pittman, Bartels, Downey, Glauber, and Good are sometimes collectively referred to herein as the "Current Director Defendants."

73.     Defendants Pittman, Fabbri, Cowan, Bartels, Downey, Glauber, Good, Boardman, Conrad, Sarff and Gimbel are sometimes collectively referred to herein as the "Individual Defendants."

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

74.     By reason of their positions as officers, directors and/or fiduciaries of Farmland Partners and because of their ability to control the business and corporate affairs of  the

Company, the Individual Defendants owed Farmland Partners and its shareholders fiduciary obligations of  good faith, loyalty and candor, and were and are required to use their utmost ability to control  and manage the Company in a fair, just, honest and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Farmland Partners and its  shareholders so as to benefit all shareholders equally and not in furtherance of their personal  interest or benefit.

75.     Each director and officer of the Company owes to Farmland Partners and its shareholders  the fiduciary duty to exercise good faith and diligence in the administration of the Company's  affairs and in the use and preservation of its property and assets, and the highest obligations of  fair dealing.

76.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Farmland Partners, were able to and did, directly and/or indirectly, exercise control  over the wrongful acts complained of herein, as well as the contents of the various  public statements issued by the Company. Due to their positions with Farmland Partners, each of the  Individual  Defendants had knowledge of material non-public information regarding the Company.

77.     To discharge their duties, the Individual Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company.  By virtue of such duties, the officers and directors of Farmland Partners were required to, among  other things:

a. Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

b. Exercise good faith to ensure that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal, state and foreign laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority;

c. Exercise good faith in supervising the preparation, filing and/or dissemination of financial statements, press releases, audits, reports or other information required by law, and in examining and evaluating any reports or examinations, audits, or other financial information concerning the financial condition of the Company;

d. Refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

e. When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

78. Moreover, Farmland Partners maintains a Code of Business Conduct and Ethics (the "Code"), which applies to everyone at every level of the Company, including all employees, officers, and all members of the Board (as dated September 8, 2015). The Code states the following, in part:

**Conflicts of Interest**

A conflict of interest arises any time the personal interests of Company Personnel interfere with his, her or their ability to act in the best interests of the Company. All Company Personnel must discharge their responsibilities on the basis of what is in the best interest of the Company independent of personal considerations or relationships.

Company Personnel must disclose any potential conflicts of interest to the Chief Financial Officer or such officer's designees, who can advise the employee as to whether or not the Company believes a conflict of interest exists. Conflicts of interest may not always be clearcut, so Company Personnel are encouraged to bring questions about particular situations to the Chief Financial Officer or such officer's designees. Company Personnel should also disclose potential conflicts of interest involving the employee's spouse, siblings, parents, in-laws, children, life partner and members of the employee's household.

Conflicts of interest involving any member of the Board of Directors shall be addressed (i) by the Board of Directors or applicable committee thereof in accordance with policies and procedures followed by the Board of Directors from time to time, and (ii) in a manner that is consistent with the discharge by the members of the Board of Directors of their fiduciary duties.

**Accuracy of Reports, Records and Accounts**

All Company Personnel are responsible for the accuracy of their respective records, time sheets and reports. Accurate information is essential to the Company's ability to meet legal and regulatory obligations and to compete effectively. The records and books of account of the Company shall meet the highest standards and accurately reflect the true nature of the transactions they record.

Business transactions must be properly authorized and completely and accurately recorded on the Company's books and records in accordance with U.S. generally accepted accounting principles and established Company financial policy. Company Personnel must not create false or misleading documents or accounting, financial or electronic records for any purpose, and no one may direct Company Personnel to do so. For example, expense reports must accurately document expenses actually incurred in accordance with Company policies.

No undisclosed or unrecorded account or fund shall be established for any purpose. No false or misleading entries shall be made in the Company's books or records for any reason. No disbursement of corporate funds or other corporate property shall be made without adequate supporting documentation or for any purpose other than as described in the documents. All Company Personnel shall comply with U.S.

generally accepted accounting principles and the Company's internal controls at all times. Company records shall be retained or disposed of in accordance with applicable legal and regulatory requirements. Company Personnel must be aware of and are encouraged to follow the policies and procedures, in effect from time to time, governing retention, storage, retrieval and handling of the Company's documents and records.

79.     The Company maintains Corporate Governance Guidelines (as dated November 20, 2017) that states, in relevant part, that the Board is responsible for the following:

> **The Board.** The Board is responsible for electing its Chairman, for appointing the executive officers of the Company and, in general, for overseeing the management of the Company's business, finances, personnel and physical assets. To this end, the Board reviews and approves the business philosophy, policies, controls and goals recommended by management and ensures that they are properly implemented by management. The Board performans [sic] an annual review of the Company's strategic plan.

80.     The Company also maintains a Code of Ethics for CEO and Senior Financial Officers (as dated September 8, 2015) that states, in relevant part:

> Records and Reports. The Chief Executive Officer and Senior Financial Officers will manage the Company's transaction and reporting systems and procedures, records and public disclosures in order that:
> - Business transactions are properly authorized and completely and accurately recorded on the Company's books and records in accordance with U.S. generally accepted accounting principles and established Company financial policy.
> - The Company's records are retained or disposed of in accordance with applicable legal and regulatory requirements.
> - Reports, documents and other public communications made by the Company are delivered in a timely, fair, complete, accurate and understandable manner.

> Compliance with Applicable Laws, Rules and Regulations. The Chief Executive Officer and Senior Financial Officers will establish and maintain mechanisms to:
> - Monitor and promote compliance with applicable governmental laws, rules and regulations.
> - Identify, report to the Chief Executive Officer, Chief Financial Officer or members of the Audit Committee of the Company, and correct in a swift and certain manner, any detected deviations from applicable governmental laws, rules and regulations, or this Code of Ethics.

- Hold the appropriate individuals accountable for deviations from applicable governmental laws, rules and regulations, or this Code of Ethics, and make such individuals subject to disciplinary action, up to and including termination of employment with the Company.

81.   The Company also has an Audit Committee, Compensation Committee, and a Nominating and Corporate Governance Committee, each with a respective charter describing the committee's duties and responsibilities.

82.   Pursuant to the Audit Committee Charter (as dated November 20, 2017), the Audit Committee members' duties and responsibilities include the following:

The Committee has the authority to conduct any investigation appropriate to fulfilling its responsibilities as it shall deem appropriate, including the authority to request any officer, employee, or advisor of the Company to meet with the Committee or any advisors engaged by the Committee. Without limiting the foregoing, the Committee shall have direct access to the independent registered public accounting firm, the Company's internal auditor and the Company's investment advisors. The Committee has the authority to retain in its sole discretion, at the Company's expense, special legal, accounting, or other consultants or experts that it deems necessary in the performance of its duties, on the same terms as if the Board authorized the retention. The Committee is empowered, without further action by the Board, to cause the Company to pay the ordinary administrative expenses of the Committee that are necessary or appropriate in carrying out its duties.

The Committee shall also review the policies and procedures adopted by the Company to fulfill its responsibilities regarding the fair and accurate presentation of financial statements in accordance with U.S. generally accepted accounting principles ("GAAP"), the New York Stock Exchange (the "NYSE"), and the applicable rules and regulations of the Securities and Exchange Commission (the "SEC").

83.   According to the 2019 Proxy Statement, the role of the Board in risk oversight includes the following:

One of the key functions of the Board is informed oversight of our risk management process. The Board administers this oversight function directly, with support from its three standing committees – the Audit Committee, the Nominating and Corporate Governance Committee and the Compensation Committee – each of

which addresses risks specific to their respective areas of oversight. In particular, our Audit Committee has the responsibility to consider and discuss our major financial risk exposures and the steps our management has taken to monitor and control these exposures, including guidelines and policies to govern the process by which risk assessment and management is undertaken. The Audit Committee also monitors compliance with legal and regulatory requirements, in addition to oversight of the performance of our internal audit function. Our Nominating and Corporate Governance Committee monitors the effectiveness of our corporate governance guidelines, including whether they are successful in preventing illegal or improper liability-creating conduct. Our Compensation Committee assesses and monitors whether any of our compensation policies and programs has the potential to encourage excessive risk-taking.

84.     The 2019 Proxy Statement explains that the Audit Committee charter includes the

Audit Committees' oversight responsibilities related to the following:

• our accounting and financial reporting processes; • the integrity of our consolidated financial statements and financial reporting process; • our systems of disclosure controls and procedures and internal control over financial reporting; • our compliance with financial, legal and regulatory requirements; • the evaluation of the qualifications, independence and performance of our independent registered public accounting firm; • the performance of our internal audit function; and • our overall risk profile.

85.     Each Individual Defendant, by virtue of his or her position as a director and/or

officer owed to the Company and to its shareholders the fiduciary duty of loyalty, good faith,

candor and the exercise of due care and diligence in the management and administration of the

affairs of the Company, as well as in the use and preservation of its property and assets.  The

conduct of the Individual Defendants complained of herein involves a knowing and culpable

violation of their obligations as directors and/or officers of Farmland Partners, the absence of good

faith on their part and a reckless disregard for their duties to the Company and its shareholders that

the Individual Defendants were aware or should have been aware posed a risk of serious injury to

the Company.

86.     The Individual Defendants breached their duties of loyalty, care, candor and good faith by: (i) allowing for materially inadequate controls over the Company's policies and practices with respect to reporting and disclosure; (ii) allowing the Company to file false and misleading periodic reports and other filings with the SEC; (iii) allowing the Company to fail to disclose pertinent, material, and important information in a timely manner; (iv) failing to take appropriate remedial action when the Board knew, or should have known, that the Company was entering into non-arm's-length loans; (v) mismanaging corporate assets by providing loans to Niebur who subsequently filed for bankruptcy; (vi) mismanaging corporate assets by bringing a lawsuit in response to the *Rota Fortunae* Report; (vii) managing the Company in a manner not aligned with shareholders' interests; and (viii) causing substantial damage to the Company's credibility, corporate image, and goodwill.

## SUBSTANTIVE ALLEGATIONS

**A.**     **Background**

87.     According to the Company's SEC filings, Farmland Partners is an internally managed real estate company that owns and seeks to acquire high-quality farmland located in agricultural markets throughout North America and makes loans to farmers secured by farm real estate.

88.     According to the Company's SEC filings, Farmland Partners is the largest public farmland REIT in the country with a portfolio of approximately 166,000 acres in 17 states.  The Company elects to be taxed as a REIT for U.S. federal income tax purposes.

89.     In August 2015, the Company introduced its Loan Program.  According to the Company, the Loan Program provides loans to third-party farmers (both tenants and non-tenants).

90.     According to a press release issued by the Company on July 17, 2018, Niebur is a tenant of the Company and worked for the Company as a farm manager from September 2015 to December 2017.  According to the same press release, Hough is a tenant of the Company and from April 16, 2014 through April 16, 2018, he worked as a consultant of the Company.  Moreover, the Company explains that Hough and Pittman are longtime business partners.

91.     Farmland Partners is based in Denver, Colorado.  Its common stock trades on the NYSE under the ticker symbol "FPI", and its Series B preferred stock trades on the NYSE under the ticker symbol "FPI.B".

**B.**     **False and Misleading Statements and/or Omissions**

92.      On March 15, 2016, the Company filed a Form 10-K for the fiscal year ended December 31, 2015 (the "2015 10-K") with the SEC.  The 2015 10-K stated that the Company's internal control over financial reporting and disclosure controls and procedures were effective as of December 31, 2015. The 2015 10-K was signed by Defendants Pittman and Fabbri, with Defendant Pittman also signing on behalf of Farmland Partners.  Defendants Bartels, Downey, Glauber and Sarff all signed the 2015 10-K in their roles as directors.  The 2015 10-K also contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Pittman and Fabbri attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

93.     The 2015 10-K stated that only "7.8% of the total acres in [Farmland Partners'] portfolio (representing approximately 12.75% of our total 2016 contractual rent) are leased to either Astoria Farms or Hough Farms, our former related tenants" and that since these leases "were

negotiated between related parties[,] their terms, including rent payable to [Farmland Partners] may have been different if they were negotiated with unaffiliated third parties," stating in pertinent part:

> **The leases with our former related tenants were not negotiated on an arm's-length basis and we may not be able to renew those leases on similar terms or at all now that those tenants are with unaffiliated third parties.**
>
> As of the date of this Annual Report, 7.8% of the total acres in our portfolio (representing approximately 12.75% of our total 2016 contractual rent) are leased to either Astoria Farms or Hough Farms, our former related tenants. At the time the leases with our related tenants were negotiated Mr. Pittman had a 28.3% indirect partnership interest in, and controlled, Astoria Farms, and had an 18.75% indirect partnership interest in Hough Farms. Mr. Hough had a 4.3% indirect partnership interest in Astoria Farms and a 28.3% indirect partnership interest in Hough Farms. Mr. Hough manages the farming operations of both of our former related tenants. As such, the leases between us and our former related tenants, which have terms that range from one to three years, were negotiated between related parties and their terms, including rent payable to us may have been different if they were negotiated with unaffiliated third parties.

94.    On May 10, 2016, Farmland Partners held a conference call with analysts and investors to discuss Farmland's first quarter of 2016 financial results. During the call, Defendant Pittman stated the following:

> So given that **everything we have has been - there's been an arm's length market transaction of some sort in the last two years**, we think acquisition cost is probably the safest judgment of value. If we get out another two or three years and a major portion of this portfolio has been held for five years or more, doing some third-party appraisals, for example, would make sense. But this idea that you hold something for a year and it's up 20%, that frankly I believe is hogwash. The market is more efficient than that.

(Emphasis added).

95.    On February 23, 2017, the Company filed a Form 10-K for the fiscal year ended December 31, 2016 (the "2016 10-K") with the SEC.  The 2016 10-K stated that the Company's internal control over financial reporting and disclosure controls and procedures were effective as

of December 31, 2016.  The 2016 10-K was signed by Defendants Pittman and Fabbri, with

Defendant Pittman also signing on behalf of Farmland.   Defendants Bartels, Boardman, Conrad,

Downey, Gimbel, Glauber and Sarff all signed the 2016 10-K in their roles as directors.   The 2016

10-K also contained signed SOX certifications by Defendants Pittman and Fabbri attesting to the

accuracy of financial reporting, the disclosure of any material changes to the Company's internal

controls over financial reporting, and the disclosure of all fraud.

96.     The 2016 10-K merely disclosed the following concerning Farmland Partners'

related party transactions:

**Note 4—Related Party Transactions**

See "Note 5 — Real Estate" for related party acquisition of the Illinois farm on
June 30, 2015.

Effective as of December 31, 2015, Mr. Pittman neither owns any direct or indirect
interest in, nor has control of, Astoria Farms and Hough Farms. As of December
31, 2016 and 2015, 6% and 11%, respectively, of the acres in the Company's farm
portfolio were rented to and operated by Astoria Farms or Hough Farms, both of
which were related parties until December 31, 2015. Astoria Farms is a partnership
in which Pittman Hough Farms LLC ("Pittman Hough Farms"), which was
previously 75% owned by Mr. Pittman, had a 33.34% interest. The balance of
Astoria Farms was held by limited partnerships in which Mr. Pittman was
previously the general partner. Hough Farms is a partnership in which Pittman
Hough Farms previously had a 25% interest. The aggregate rent recognized by the
Company for these entities for the years ended December 31, 2016, 2015 and 2014
was $2,464,905, $2,720,757 and $2,474,839, respectively. As of December 31,
2016 and 2015, the Company did not have any accounts receivable from these
entities.

For the years ended December 31, 2016, 2015 and 2014, Pittman Hough Farms
incurred $0, $0 and $219,597, respectively, in professional fees on behalf of the
Company.  These fees were reimbursed by the Company.  As of December 31, 2016
and 2015, the Company had no outstanding payables to Pittman Hough Farms.

Effective as of December 31, 2015, Mr. Pittman does not own any interest in
American Agriculture. American Agriculture Corporation ("American
Agriculture") is a Colorado corporation that was 75% owned by Mr. Pittman and

25% owned by Jesse J. Hough, who provides consulting services to the Company. On April 16, 2014, the Company entered into a shared services agreement with American Agriculture pursuant to which the Company paid American Agriculture an annual fee of $175,000 in equal quarterly installments in exchange for administrative and accounting services. The agreement was terminated effective December 31, 2014, by mutual agreement of both parties. The Company incurred $123,958 in fees related to the shared services agreement during the year ended December 31, 2014, which are included in general and administrative expenses in the consolidated statements of operations.

The Company reimbursed American Agriculture $0 and $21,259, respectively, for general and administrative expenses during the year ended December 31, 2016 and 2015, which are included in general and administrative expenses in the consolidated statements of operations. As of December 31, 2016 the Company had outstanding receivables from American Agriculture of $48,728, while at December 31, 2015, the Company had outstanding receivable to American Agriculture of $5,574, included in accrued expenses in the consolidated balance sheets.

On July 21, 2015, the Company entered into a lease agreement with American Agriculture Aviation LLC ("American Ag Aviation") for the use of a private plane. American Ag Aviation is a Colorado limited liability company that is owned 100% by Mr. Pittman. During the years ended December 31, 2016 and 2015, the Company incurred costs of $169,708 and $103,090, respectively, from American Ag Aviation for use of the aircraft in accordance with the lease agreement. These costs were recognized based on the nature of the associated use of the aircraft, as follows: (i) general and administrative - expensed as general and administrative expenses within the Company's consolidated statements of operations; (ii) land acquisition (accounted for as an asset acquisition) - allocated to the acquired real estate assets within the Company's consolidated balance sheets; and (iii) land acquisition (accounted for as a business combination) - expensed as acquisition and due diligence costs within the Company's consolidated statements of operations.

On April 1, 2015, the TRS and Hough Farms entered into a custom farming arrangement, pursuant to which Hough Farms performs custom farming on 563 acres. During the year ended December 31, 2015, the Company incurred $51,303 in custom farming costs, which are included in inventory in the combined consolidated balance sheets. As of December 31, 2015, the Company owed Hough Farms $11,946 for fungicide application related costs, which are included in accrued expenses in the combined consolidated balance sheet.

On March 21, 2014 and April 16, 2014, the Company and FP Land entered into reimbursement agreements with Pittman Hough Farms to reimburse Pittman Hough Farms for costs incurred to complete the IPO and the FP Land Merger. The amount of the costs that were reimbursed was reduced by interest expense of $78,603

related to outstanding debt at the time of the FP Land Merger, which was accrued by FP Land as of December 31, 2013. The aggregate net reimbursable amount under the agreements was $1,361,321. On June 9, 2014, the Company and the Operating Partnership entered into an additional reimbursement agreement with Pittman Hough Farms for $51,537 in professional fees incurred prior to the IPO.

97.    On May 10, 2017, the Company filed a Form 10-Q for the first quarter ended March 31, 2017 (the "1Q 2017 10-Q") with the SEC. The 1Q 2017 10-Q stated that the Company's disclosure controls and procedures were effective as of March 31, 2017, and that "[t]here were no changes in the Company's internal control over financial reporting during the quarter ended March 31, 2017 that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting." The 1Q 2017 10-Q was signed by Defendants Pittman and Fabbri.  The 1Q 2017 10-Q contained signed SOX certifications by Defendants Pittman and Fabbri attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

98.    The 1Q 2017 10-Q merely disclosed the following concerning Farmland Partners' related party transactions, stating in pertinent part:

**Note 4—Related Party Transactions**

On July 21, 2015, the Company entered into a lease agreement with American Agriculture Aviation LLC ("American Ag Aviation") for the use of a private plane. American Ag Aviation is a Colorado limited liability company that is owned 100% by Mr. Pittman.  During the three months ended March 31, 2017 and 2016, the Company incurred costs of $83,791 and $47,053, respectively, from American Ag Aviation for use of the aircraft in accordance with the lease agreement. These costs were recognized based on the nature of the associated use of the aircraft, as follows: (i) general and administrative - expensed as general and administrative expenses within the Company's consolidated statements of operations; (ii) land acquisition (accounted for as an asset acquisition) - allocated to the acquired real estate assets within the Company's consolidated balance sheets; and (iii) land acquisition (accounted for as a business combination) -

expensed as acquisition and due diligence costs within the Company's consolidated statements of operations.

99.     On July 21, 2017, the Company filed a Form 10-Q for the second quarter ended June 30, 2017 (the "2Q 2017 10-Q") with the SEC.  The 2Q 2017 10-Q stated that the Company's disclosure controls and procedures were effective as of June 30, 2017, and that "[t]here were no changes in the Company's internal control over financial reporting during the quarter ended June 30, 2017 that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting." The 2Q 2017 10-Q was signed by Defendants Pittman and Fabbri. The 2Q 2017 10-Q contained signed SOX certifications by Defendants Pittman and Fabbri attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

100.    The 2Q 2017 10-Q merely disclosed the following concerning Farmland Partners' related party transactions, stating in pertinent part:

**Note 4—Related Party Transactions**

On July 21, 2015, the Company entered into a lease agreement with American Agriculture Aviation LLC ("American Ag Aviation") for the use of a private plane. American Ag Aviation is a Colorado limited liability company that is owned 100% by Mr. Pittman.  The Company incurred costs of $135,478 and $96,469, respectively, during the six months ended June 30, 2017 and 2016 and $51,687 and $49,416, respectively, during the three months ended June 30, 2017 and 2016 from American Ag Aviation for use of the aircraft in accordance with the lease agreement. These costs were recognized based on the nature of the associated use of the aircraft, as follows: (i) general and administrative - expensed as general and administrative expenses within the Company's consolidated statements of operations; (ii) land acquisition (accounted for as an asset acquisition) - allocated to the acquired real estate assets within the Company's consolidated balance sheets; and (iii) land acquisition (accounted for as a business combination) - expensed as acquisition and due diligence costs within the Company's consolidated statements of operations.

101.    On November 9, 2017, the Company filed a Form 10-Q for the third quarter ended September 30, 2017 (the "3Q 2017 10-Q") with the SEC. The 3Q 2017 10-Q stated that the Company's disclosure controls and procedures were effective as of September 30, 2017, and that "[t]here were no changes in the Company's internal control over financial reporting during the quarter ended September 30, 2017 that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting." The 3Q 2017 10-Q was signed by Defendants Pittman and Fabbri. The 3Q 2017 10-Q contained signed SOX certifications by Defendants Pittman and Fabbri attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

102.    The 3Q 2017 10-Q merely disclosed the following concerning Farmland Partners' related party transactions, stating in pertinent part:

**Note 4—Related Party Transactions**

On July 21, 2015, the Company entered into a lease agreement with American Agriculture Aviation LLC ("American Ag Aviation") for the use of a private plane. American Ag Aviation is a Colorado limited liability company that is owned 100% by Mr. Pittman. The Company incurred costs of $0.16 million and $0.14 million, respectively, during the nine months ended September 30, 2017 and 2016 and $0.02 million and $0.05 million, respectively, during the three months ended September 30, 2017 and 2016 from American Ag Aviation for use of the aircraft in accordance with the lease agreement. These costs were recognized based on the nature of the associated use of the aircraft, as follows: (i) general and administrative - expensed as general and administrative expenses within the Company's consolidated statements of operations; (ii) land acquisition (accounted for as an asset acquisition) - allocated to the acquired real estate assets within the Company's consolidated balance sheets; and (iii) land acquisition (accounted for as a business combination) - expensed as acquisition and due diligence costs within the Company's consolidated statements of operations.

103.    On March 5, 2018, the Company filed a Form 10-K for the fiscal year ended December 31, 2017 (the "2017 10-K") with the SEC.  The 2017 10-K stated that the Company's internal control over financial reporting and disclosure controls and procedures were effective as of December 31, 2017.  The 2017 10-K was signed by Defendants Pittman and Fabbri, with Defendant Pittman also signing on behalf of Farmland Partners. Defendants Bartels, Downey, Gimbel, Glauber and Good all signed the 2017 10-K in their roles as directors.  The 2017 10-K also contained signed SOX certifications by Defendants Pittman and Fabbri attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

104.    The 2017 10-K merely disclosed the following concerning Farmland Partners' related party transactions, stating in pertinent part:

**Note 4—Related Party Transactions**

On July 21, 2015, the Company entered into a lease agreement with American Agriculture Aviation LLC ("American Ag Aviation") for the use of a private plane. American Ag Aviation is a Colorado limited liability company that is owned 100% by Mr. Pittman, the Company's CEO. During the years ended December 31, 2017, 2016 and 2015, the Company incurred costs of $0.2 million, $0.2 million and $0.1 million, respectively, from American Ag Aviation for use of the aircraft in accordance with the lease agreement. These costs were recognized based on the nature of the associated use of the aircraft, as follows: (i) general and administrative - expensed as general and administrative expenses within the Company's Consolidated Statements of Operations; (ii) land acquisition (accounted for as an asset acquisition) - allocated to the acquired real estate assets within the Company's consolidated balance sheets; and (iii) land acquisition (accounted for as a business combination) - expensed as acquisition and due diligence costs within the Company's Consolidated Statements of Operations. As of December 31, 2017, and 2016 the Company had outstanding payables to American Agriculture Aviation LLC of $0.01 million and $0.01 million, respectively.

Effective as of December 31, 2015, Mr. Pittman neither owns any direct or indirect interest in, nor has control of, Astoria Farms and Hough Farms. As of December

31, 2017, and 2016, 4% and 6%, respectively, of the acres in the Company's farm portfolio were rented to and operated by Astoria Farms or Hough Farms, both of which were related parties until December 31, 2015. Astoria Farms is a partnership in which Pittman Hough Farms LLC ("Pittman Hough Farms"), which was previously 75% owned by Mr. Pittman, had a 33.34% interest. The balance of Astoria Farms was held by limited partnerships in which Mr. Pittman was previously the general partner. Hough Farms is a partnership in which Pittman Hough Farms previously had a 25% interest. The aggregate rent recognized by the Company for these entities for the years ended December 31, 2017, 2016 and 2015 was $2.0 million, $2.5 million and $2.7 million, respectively. As of December 31, 2016, and 2015, the Company did not have any accounts receivable from these entities.

For the years ended December 31, 2017, 2016 and 2015, Pittman Hough Farms incurred $0, $0 and $0, respectively, in professional fees on behalf of the Company. These fees were reimbursed by the Company.

Effective as of December 31, 2015, Mr. Pittman does not own any interest in American Agriculture Corporation (''American Agriculture''). American Agriculture is a Colorado corporation that was 75% owned by Mr. Pittman and 25% owned by Jesse J. Hough, who provides consulting services to the Company. The Company reimbursed American Agriculture $0, $0 and $21,259, respectively, for general and administrative expenses during the year ended December 31, 2017, 2016 and 2015, which are included in general and administrative expenses in the consolidated statements of operations.

105.    On May 10, 2018, the Company filed a Form 10-Q for the first quarter ended March 31, 2018 (the "1Q 2018 10-Q") with the SEC.  The 1Q 2018 10-Q stated that the Company's disclosure controls and procedures were effective as of March 31, 2018, and that "[t]here were no changes in the Company's internal control over financial reporting during the quarter ended March 31, 2018 that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting."  The 1Q 2018 10-Q was signed by Defendants Pittman and Fabbri.  The 1Q 2018 10-Q contained signed SOX certifications by Defendants Pittman and Fabbri attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

106.   The 1Q 2018 10-Q merely disclosed the following concerning Farmland Partners' related party transactions, stating in pertinent part:

**Note 4—Related Party Transactions**

On July 21, 2015, the Company entered into a lease agreement with American Agriculture Aviation LLC ("American Ag Aviation") for the use of a private plane. American Ag Aviation is a Colorado limited liability company that is owned 100% by Mr. Pittman. The Company incurred costs of $0.04 million and $0.08 million, respectively, during the three months ended March 31, 2018 and 2017 from American Ag Aviation for use of the aircraft in accordance with the lease agreement. These costs were recognized based on the nature of the associated use of the aircraft, as follows: (i) general and administrative - expensed as general and administrative expenses within the Company's consolidated statements of operations; (ii) land acquisition (accounted for as an asset acquisition) – allocated to the acquired real estate assets within the Company's consolidated balance sheets; and (iii) land acquisition (accounted for as a business combination) - expensed as acquisition and due diligence costs within the Company's consolidated statements of operations.

107.   On August 9, 2018, the Company filed a Form 10-Q for the second quarter ended June 30, 2018 (the "2Q 2018 10-Q") with the SEC.  The 2Q 2018 10-Q stated that the Company's disclosure controls and procedures were effective as of June 30, 2018, and that "[t]here were no changes in the Company's internal control over financial reporting during the quarter ended June 30, 2018 that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting."  The 2Q 2018 10-Q was signed by Defendants Pittman and Fabbri.  The 2Q 2018 10-Q contained signed SOX certifications by Defendants Pittman and Fabbri attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

108.   The 2Q 2018 10-Q merely disclosed the following concerning Farmland Partners' related party transactions, stating in pertinent part:

**Note 4—Related Party Transactions**

On July 21, 2015, the Company entered into a lease agreement with American Agriculture Aviation LLC ("American Ag Aviation") for the use of a private plane. American Ag Aviation is a Colorado limited liability company that is owned 100% by Mr. Pittman. The Company incurred costs of $0.04 million and $0.07 million, and $0.05 million and $0.1 million, respectively, during the three and six months ended June 30, 2018 and 2017 from American Ag Aviation for use of the aircraft in accordance with the lease agreement. These costs were recognized based on the nature of the associated use of the aircraft, as follows: (i) general and administrative - expensed as general and administrative expenses within the Company's consolidated statements of operations; (ii) land acquisition (accounted for as an asset acquisition) - allocated to the acquired real estate assets within the Company's consolidated balance sheets; and (iii) land acquisition (accounted for as a business combination) - expensed as acquisition and due diligence costs within the Company's consolidated statements of operations.

109.    On November 9, 2018, the Company filed a Form 10-Q for the third quarter ended September 30, 2018 (the "3Q 2018 10-Q") with the SEC.  The 3Q 2018 10-Q stated that the Company's disclosure controls and procedures were effective as of September 30, 2018, and that "[t]here were no changes in the Company's internal control over financial reporting during the quarter ended September 30, 2018 that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting."  The 3Q 2018 10-Q was signed by Defendants Pittman and Fabbri. The 3Q 2018 10-Q contained signed SOX certifications by Defendants Pittman and Fabbri attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

110.    The 3Q 2018 10-Q merely disclosed the following concerning Farmland Partners' related party transactions, stating in pertinent part:

**Note 4—Related Party Transactions**

On July 21, 2015, the Company entered into a lease agreement with American Agriculture Aviation LLC ("American Ag Aviation") for the use of a private plane.

American Ag Aviation is a Colorado limited liability company that is owned 100% by Mr. Pittman. The Company incurred costs of $0.04 million and $0.10 million, and $0.02 million and $0.16 million, respectively, during the three and nine months ended September 30, 2018 and 2017 from American Ag Aviation for use of the aircraft in accordance with the lease agreement. These costs were recognized based on the nature of the associated use of the aircraft, as follows: (i) general and administrative - expensed as general and administrative expenses within the Company's consolidated statements of operations; (ii) land acquisition (accounted for as an asset acquisition) - allocated to the acquired real estate assets within the Company's consolidated balance sheets; and (iii) land acquisition (accounted for as a business combination) - expensed as acquisition and due diligence costs within the Company's consolidated statements of operations.

111.    On January 26, 2018, Niebur filed a Chapter 12 bankruptcy petition in the U.S. Bankruptcy Court in the District of Colorado.  Niebur filed both a personal petition on behalf of him and his wife, and also a petition on behalf of Niebur Farms, Inc.  The Niebur bankruptcy petition lists Farmland Partners as a creditor.  Niebur, and his wife Stacie, (the "Nieburs") entered into two leases with Farmland Partners in March 2017 for a four-year term that covers approximately 1,000 acres of tillable land in exchange for an annual lease payment of more than $85,000 payable to the Company.  As part of the Nieburs' plan for reorganization, the Nieburs sought the ability to assume these leases and assign the leases to an entity controlled by Niebur named 7-Star, LLC.  On May 24, 2018, Farmland Partners filed an objection to the assumption and assignment of the leases based in part on its assertion that the debtors (i.e., the Nieburs and Niebur's company) failed to demonstrate they would be able to make the payments under the proposed reorganization plan.  While in the midst of objecting to the reorganization plan and requesting that the Court deny the plan, the Company announced in a press release on July 17, 2018, that the "loans made to Ryan Niebur are good loans and will perform well for the Company." On September 19, 2018, the bankruptcy court granted the Nieburs' motion to assume and assign the land leases.  The Company has failed to disclose any aspect of the Niebur bankruptcy

proceedings in any SEC filing including its 1Q 2018 10-Q, 2Q 2018 10-Q, 3Q 2018 10-Q and Form 10-K for year ended December 31, 2018 filed with the SEC on March 15, 2019 ("2018 10-K"). To date, the Company has made no disclosure whatsoever concerning Niebur's personal or business bankruptcies.

112. The statements referenced in ¶¶ 92-111 above were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business, operational and financial results, which were known to Individual Defendants or recklessly disregarded by them. Specifically, Individual Defendants made false and/or misleading statements and/or failed to disclose: (1) that Farmland Partners artificially increased revenues by making non-arm's-length loans to tenants who used the loans to pay the cash back to Farmland Partners as rent; (2) that as a result, Farmland Partners' earnings during fiscal year 2017 were overstated; (3) important details of the Loan Program, including the identities of the non-arm's-length debtors and their ability to satisfy the loans; and (4) as a result, Individual Defendants' statements about the Company's business, operations and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

**C.    The _Rota Fortunae_ Report**

113. On July 11, 2018, before market hours, the _Rota Fortunae_ Report was published and entitled "Related-Party Tenants Introduce Significant Risk Of Insolvency." The _Rota Fortunae_ Report summarized its findings as follows:

**Summary**

- We believe FPI is artificially increasing revenues by making loans to related-party tenants who round-trip the cash back to FPI as rent; 310% of 2017 earnings could be made-up.

- FPI has neglected to disclose that the majority of its loans have been made to two members of the management team, including Jesse Hough, CEO Paul Pittman's long-time business partner.

- A UCC shows "Pittman Hough" pledged shares of FPI for a loan then FPI's stock fell 30%, and two weeks after reaching an all-time low, FPI began lending to Hough.

- Four board members and FPI's president have resigned since FPI began lending to Hough, and in March, FPI dismissed its auditor.

- We found evidence that strongly supports FPI has significantly overpaid for properties; under normal circumstances, we estimate FPI is worth $4.85/share, but we think the shares are uninvestible.

114.   The *Rota Fortunae* Report further stated, in relevant part:

When we started looking into FPI, we found it was playing classic accounting games like capitalizing part of the expense to lease CEO Paul Pittman's personal jet and excluding farms from its same-property rent number. But it was not until we reviewed hundreds of deed records in dozens of counties across the country that we came to believe that FPI faces a significant risk of insolvency.

**Our research leads us to believe that FPI is using its mortgage-lending program to artificially increase revenues by making loans to related-party tenants who roundtrip the cash back to FPI as rent and interest revenue. We believe these loans lack economic substance because, whenever they come due, FPI happens to acquire the property collateralizing the loan, like a bank buying a house at full price when the mortgage matures.**

**And the transactions follow a pattern, whereby FPI makes a loan against a property, acquires the property around the time the loan matures, enters into a lease with the borrower, and, days later, lends more money to the borrower/new tenant. In total, we believe up to 6% of 2017 revenues and 310% of 2017 net income could be the result of transactions that are just moving money from one side of the desk to the other.**

While FPI discloses its loans, it has neglected to disclose that over 70% of its loans (in dollars) have been made to Ryan Niebur and Jesse Hough (both FPI tenants and members of FPI's management team). Ryan Niebur is a now-bankrupt tenant (not disclosed), who after defaulting on an FPI loan (not disclosed) was bailed out when FPI acquired his properties, falsely reported the purchase as a loan and then lent him an additional $61,800 the day after he signed a lease with FPI for $61,750.

41

Jesse Hough is Paul Pittman's long-time business partner, the co-founder of FPI and an FPI consultant. In July 2017, FPI made a loan secured by one of Hough's properties, which FPI then acquired two weeks before the loan matured and leased back to him just days before FPI lent him another $5.25 Million, this time as the president of an inactive entity that corporate records show he has no affiliation with, and that is secured by land that deed records show he does not own.

Our opinion that FPI appears to be playing accounting games is further bolstered by a Colorado UCC filing that shows "Pittman Hough" pledged shares of FPI for a bank loan just days before FPI signed an agreement that Pittman later stated he thought would drive the stock price higher. He was wrong. Instead the stock tanked, and two weeks after hitting an all-time low, FPI made its first loan to Jesse Hough.

**While shareholders have expressed concern about FPI's ability to maintain its dividend, we think this significantly understates the real risk, which is that FPI has relied on a hamster wheel of dilutive debt and equity raises to stay afloat. If investors lose faith, FPI may quickly find that its endless stream of capital has run dry. With only $19 Million in cash, we think FPI will not only be forced to cut its dividend but also faces a significant risk of insolvency.**

And it appears that we are not the only concerned party. Since making its first loan to Jesse Hough in July 2017, four board members and FPI's president have resigned. And in March, FPI dismissed PWC for EKS&H (auditor for MusclePharm and Heska).

But even if the loans to management, misstated financials, pledged shares, potential insolvency, insider departures and dismissed auditor turn out to be benign risks, we still think FPI's shares carry significant downside. We found evidence that suggests FPI has significantly overpaid for properties. We estimate that under normal circumstances FPI would be worth $4.85 per share (45% below the current stock price). But there is never just one cockroach, and we have no confidence in FPI's financials. Accordingly, we think FPI is uninvestible.

115.   The *Rota Fortunae* Report further detailed, in relevant part:

**The FPI Loan Program**

In August 2015, Farmland Partners introduced the FPI Loan Program to "address a market need created by short term cash flow pressure on farmers who otherwise maintain solid balance sheets" but cannot get traditional funding. The press release promoted FPI's quick underwriting abilities and conservative loan-to-value criteria. Further disclosure given in the 3Q2015 10-Q (pg. 21) states "the company intends to make loans to third-party farmers (both tenant and non-tenant)."

*          *          *

[W]e found that FPI has neglected to disclose that $9.2 Million (out of a total of $15.4 Million) in loans have been made to Ryan Niebur and Jesse Hough, who are both members of FPI's management team. We believe these loans lack economic substance and have been used to artificially increase revenues. Publicly available documents show that FPI has engaged in a pattern of transactions where it makes a loan against a property, acquires the property around the time the loan matures, enters into a lease with the borrower, and days later lends more money to the borrower/new tenant.

116.    According to the *Rota Fortunae* Report, the loans made to Hough included the following:

- On July 25, 2017, Farmland Partners made a $100,000 loan to Hough through an entity named PHS Holdings.

- On August 25, 2017, Farmland Partners made a $669,000 loan to Hough through Hough Farms. This loan was paid off on February 2, 2018, a couple weeks after Hough received a loan from the Company on January 18, 2018.

- On January 18, 2018, Farmland Partners made a $5.25 million loan to Siffring Farms. Nebraska corporate records show that Siffring Farms is an inactive LLC whose president is Duane R. Siffring and the deed of trust for the loan was signed by Hough as President of Siffring Farms.

117.    Hough was a consultant of the Company from April 16, 2014 through April 16, 2018; however, Plaintiff could not locate any specific disclosures in the Company's SEC filings about these loans being provided to Hough. The Company previously disclosed related party transactions with Hough, including in the Company's 2017 10-K, but did not disclose any of the loans made to Hough as related party transactions.

43

118.    Niebur worked for the Company as a farm manager from September 2015 to December 2017.   According to the *Rota Fortunae* Report, Niebur received loans from the Company that included a $980,000 loan on October 30, 2015 and a $2.194 million loan during the first quarter of 2017.   Plaintiff could not locate any specific disclosures in the Company's SEC filings about these loans being provided to Niebur.    Furthermore, according to a Washington County, Colorado deed, Niebur defaulted on a loan and Farmland Partners acquired a farm that was used for collateral as a result, and this deed specifically states that Niebur owes a remaining balance of $240,000.  The *Rota Fortunae* Report states that this farm was the collateral used for the $980,000 loan. Plaintiff also could not locate any disclosure from the Company regarding Niebur's default on this loan.

119.    The *Rota Fortunae* Report further asserts that the $2.194 million loan to Niebur was actually in substance an acquisition of three properties on March 16, 2017 and was incorrectly treated as a loan on the Company's financial statements.

120.    Following the *Rota Fortunae* Report, Farmland Partners' stock fell $3.37 per share, or over 38%, from its previous closing price to close at $5.28 per share on July 11, 2018.

**D.**    **The Aftermath**

**1.**    *Rota Fortunae* **Litigation**

121.    On July 24, 2018, the Company filed a lawsuit in District Court, Denver County, Colorado, against the individuals involved in writing and distributing the *Rota Fortunae* Report. The complaint contains the following claims: (1) defamation/defamation by libel per se; (2) disparagement; (3) intentional interference with prospective business relations; (4) unjust

enrichment; (5) deceptive trade practice in violation of the Colorado Consumer Protection Act; and (6) civil conspiracy.

122.    The Company's 3Q 2018 10-Q reports that legal and accounting expenses increased by $0.6 million compared to the three months ended September 30, 2018, which the Company attributes to legal fees incurred in relation to the *Rota Fortunae* Report. The Company's 2018 10-K reports that legal and accounting expenses increased by $0.9 million, or 60.4%, compared to the year ended December 31, 2017, which the Company primarily attributes to litigation related to the *Rota Fortunae* Report.

123.    On October 5, 2018, *Rota Fortunae* filed a motion to dismiss the complaint arguing that the lawsuit "is a SLAPP suit filed solely as retaliation" and that the Company's complaint "fails to identify one false, defamatory fact in the Article."

124.    The *Rota Fortunae* motion to dismiss explains that its report "meticulously disclosed all the facts upon which he based his analysis and conclusions" and "disclosed (and provided live links to) the dozens of public documents and records that he relied on in reaching his conclusion that [Farmland Partners'] stock was overpriced and its accounting practices were questionable."

125.    The *Rota Fortunae* motion to dismiss once again argues that Farmland Partners, "failed to disclose numerous matters that would be of interest to investors, including the names of the borrowers, the uses of the loan funds, that 70% of the loan volume went to two related-party tenants, that [Farmland Partners] was acquiring properties that secured mortgages it had made to tenants and that the Defendant believes [Farmland Partners] misstated its financials when it reported certain transactions as loans instead of acquisitions—a belief that we now know was well

supported by the fact that [Farmland Partners] had to provide 'additional information' in its public rebuttal to explain why it did so."

### 2.    Second Quarter 2018 Earnings Release

126.    On August 8, 2018, the Company released its second quarter 2018 financial results. On August 9, 2018, Farmland Partners held a conference call with analysts and investors to discuss the Company's second quarter 2018 financial results. During the call, Defendant Pittman focused extensively on the *Rota Fortunae* Report by repeatedly referencing the report and the purported impact it had on the stock price.   Defendant Pittman's remarks during the conference call include the following:

> I would now like to touch briefly on the misleading anonymously written Seeking Alpha report.  We issued a detailed press release refuting the allegations.  So I will not go through the Seeking Alpha report point-by-point.

> We have no intent on dwelling on this issue.  We are instead focused on what it means for our shareholder and what we can do.  We will pursue litigation and cooperate with law enforcement to see that justice is done and to attempt to recoup money for our shareholders.

> We are also instituting an employee retention plan for the non-executive members of our team.  When your stock declines, like ours did, it creates many short-term issues, but it also creates significant opportunity.

> In the short-term, we will face lost revenue for new business ventures, decreased growth in acquisitions and capital expenditures and additional costs and expenses, including litigation expenses all resulting from the misleading Seeking Alpha article.

> With this short-term issue, we also find opportunities to benefit our shareholders by reinvesting in our Company by buying back our shares. We intend to repurchase discounted shares which allows us to increase the ownership of our farms at deep discounts for the benefit of all shareholders.

> Point number three, we are lowering our 2018 earnings guidance by approximately $0.10 to a range of $0.30 to $0.34 per share to account for the litigation expense, the increased G&A and the losses of revenue from asset.  Asset acquisitions, we

will not do.  Asset sales, we have made, and lost revenue opportunities from planned joint ventures.

Prior to the report, I would have characterized our earnings at the bottom end of the range, due to trade war headwinds and negative short-term impacts in particular two farms in Florida, but the overall business was performing generally quite well. After the report, obviously we have a hard time handicapping the actual additional costs we will incur, but the core business is on track and delivering as expected.

As I mentioned a moment ago, we do have two specific issues on Florida farms that have led to a modest reduction in 2018 revenues for which we have taken reserves. But they do not have any impact on long-term value potential of those particular farms or our overall portfolio.

Number four, our Board has approved an additional $30 million of common and preferred share repurchases, which results in a total of $38.5 million of available capacity for share repurchases.  Repurchasing our shares will generate returns well in excess of traditional Farmland investments available in the market today, and will lead to a significant accretion of cash flow and NAV per share.

We do not anticipate utilizing additional borrowing to fund this buyback rather we will finance repurchases using recurring cash flow and funds from asset sales.  To this point we are reducing our dividend to $0.05 per quarter and we use the savings per quarter to help fund the buybacks.

We have deliberated extensively over the decision to cut the dividend. It is especially impactful as it relates to operating partnership holders who took those OP units as a part of the farm acquisition transaction.  But given the current low stock price and the significant value that can be created from buybacks we feel that this decision to reduce the dividend is in the best interest of shareholders.

As a very large shareholder and OP unit holder this reduction of course directly impacts me and several other members of the management.  But the stock manipulation on July 11th had certainly hurt our shareholders and caused us to make some different decisions.  However, when you have the opportunity to drive NAV per share, cash flow per share of this magnitude we feel that this is an opportunity we must capitalize on.  We hope to return with stronger dividends in the future when the stock price recovers.

Asset sales create a lucrative arbitrage opportunity.  We have assembled a great portfolio of critical scale which is a source of competitive advantage but similar to our dividend discussion we will pursue asset sales at strong private market values to finance the purchase of discounted public securities until it makes sense to change that strategy.

> Number 5, moving forward we will continue to do our best to improve shareholder value and move it back forward NAV. Our NAV is likely growing according to the USDA land values reports both this year and last year. We will continue to look at all options to maximize shareholder value including the sale of non-core assets and the reinvestment in our business through buybacks.

127.   In summary, Defendant Pittman announced that: (i) the Company would be substantially cutting its quarterly dividend for the 2018 third quarter to $0.05 per share of common stock, a decrease of more than 50% from the prior quarter dividend of $0.1275 per share of common stock; (ii) the Company was lowering its 2018 earnings guidance $0.10 per share to a range of $0.30-0.34 per share from the prior range of $0.40-0.44 per share; (iii) the Board authorized an additional $30 million of buybacks of the Company's common stock and Series B Perpetual Preferred Stock; and (iv) the Company would be financing the share buyback, in part, by disposing of its properties and the cutting of the dividend. Throughout the conference call, Defendant Pittman blamed the *Rota Fortunae* Report for the Company's issues.

128.   Defendant Pittman suggests that the change in earnings guidance is in part due to "lost revenue opportunities from planned joint ventures." Given that the earnings call took place on August 9, 2018, Pittman does not explain how a potential joint venture could impact annual earnings guidance in such a short period of time especially given that such a deal would still need to close and then generate revenue.

129.   Furthermore, without a proper explanation, Defendant Pittman contends that the Company's stock price should be in line with the Company's NAV. Defendant Pittman contends that a buyback will create value for the shareholders because the stock price is not in line with NAV. In reality, the market value of the Company's properties does not have a meaningful relationship to the stock price unless Farmland Partners is planning on selling its properties soon,

and even then, shareholders would expect the funds to be reinvested into purchasing more properties. As "Beyond Savings" points out in an article entitled *Farmland Partners: Puffery*, published on May 11, 2018, "REITs are not valued based on their NAV…I find it particularly ironic that a REIT which scooped up a competitor for substantially below NAV thinks that NAV is the metric upon which their shares should be based."

130.    The conference call took place on August 9, 2018, while the *Rota Fortunae* Report was published less than a month prior, on July 11, 2018. Therefore, in less than a month following the *Rota Fortunae* Report, the Company made drastic business changes purportedly as a direct result of this report.

### 3.    November 6, 2018 Earnings Conference Call

131.    On November 6, 2018, Farmland Partners held a conference call with analysts and investors to discuss the Company's third quarter 2018 financial results. During the call, Defendant Pittman noted that the Company's "effort to achieve justice and financial recovery for our shareholders" against *Rota Fortunae* is ongoing and that the Company is "cautiously optimistic that we will achieve our goals albeit at a pace slower [than] we would like."

132.    During the call, Defendant Pittman provided additional information regarding the share buyback:

> We have since July 1 bought back 1,652,178 shares. That represents about 4.4% of the shares outstanding on July 1. Using an NAV of about $12 a share, we will have created through those buybacks, about $8.3 million of shareholder value. Given that the source of the funds is asset sales, made an 11% to 12% above book value, the return to our shareholders from these buybacks is even more significant. We expect to continue repurchasing shares based on funds availability as long as the share price stays depressed.

133.   Defendant Pittman continues to use NAV as a pretense for the buyback without explaining to shareholders that a REIT stock price is not valued based on NAV.

134.   During the quarter ending March 31, 2018, Farmland Partners repurchased approximately 780,000 shares of its common stock for approximately $6.5 million.

135.   Farmland Partners repurchased its shares throughout 2017 as well.  According to the 2017 10-K, the Company repurchased approximately 1.12 million shares of its common stock for approximately $10 million.

136.   In the 2017 10-K, the Company explained its share repurchase program:

On March 15, 2017, our Board of Directors approved a program to repurchase up to $25 million in shares of our common stock. Repurchases under this program may be made from time to time, in amounts and prices as the Company deems appropriate. Repurchases may be made in open market or privately negotiated transactions in compliance with Rule 10b-18 under the Exchange Act, subject to market conditions, applicable legal requirements, trading restrictions under our insider trading policy, and other relevant factors. In November 2017, our Board of Directors approved repurchases of our Series B Participating Preferred Stock from time to time under the share repurchase program. This share repurchase program does not obligate us to acquire any particular amount of common stock or Series B Preferred Stock and it may be modified or suspended at any time at the Company's discretion. We expect to fund repurchases under the program using cash on its balance sheet. As of December 31, 2017, we had repurchased 1,122,597 shares of our common stock at an average price per share of $8.93 for a total cost of approximately $10.0 million, including fees.

137.   The repurchase of common stock during 2017 at an average price of $8.93 per share is significantly more than the closing price of the common stock on July 11, 2018 of $5.18 per share following the revelations set forth release of the *Rota Fortunae* Report.  The repurchase of common stock during the first quarter ended March 31, 2018, at an average price of approximately $8.33 per share, was also significantly more than the closing price of common stock on July 11, 2018.  On April 25, 2019, Farmland Partners common stock closed at $6.28 per share.  Farmland

Partners common stock has not closed above $8 per share since the *Rota Fortunae* Report was published. Thus, the Individual Defendants caused the Company to buyback millions in Farmland Partners common stock at artificially inflated prices, thereby damaging the Company and its shareholders.

## DAMAGES TO FARMLAND PARTNERS CAUSED BY THE INDIVIDUAL DEFENDANTS

138.   As a direct and proximate result of the Individual Defendants' misconduct, the Individual Defendants allowed materially inadequate controls over the Company's policies and practices with respect to reporting and disclosure, caused the Company to issue false and misleading SEC filings and misleading periodic reports and other filings with the SEC, and mismanaged the Company's assets.

139.   Farmland Partners has expended and will continue to expend significant sums of money. Additional expenditures and damages that the Company has incurred as a result of the Individual Defendants' breaches of their fiduciary duty include:

a.   Costs incurred from compensation and benefits paid to the Individual Defendants who have breached their duties to Farmland Partners;

b.   Costs incurred from the non-arm's-length loans made to Hough and Niebur;

c.   Costs incurred from investigating, defending and paying any settlement or judgment in connection with the Securities Class Actions for violations of federal securities laws and governing accounting principles;

d.   Costs incurred by the Company for filing a lawsuit against *Rota Fortunae*;

e.   Costs incurred from implementing enhanced internal controls and procedures over financial reporting;

f.   Damage incurred to repurchase or buyback Farmland Partners' common stock at artificially inflated prices; and

g.   Costs incurred from the loss of Farmland Partners' customers' confidence in the Company's services.

140.   Finally, Farmland Partners' credibility, reputation and goodwill have likewise been damaged, and the Company remains exposed to significant potential liability going forward.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

141.   Plaintiff brings this action derivatively in the right and for the benefit of Farmland Partners to redress injuries suffered, and to be suffered, by Farmland Partners as a direct result of breaches of fiduciary duty and unjust enrichment.

142.   Plaintiff is a shareholder of Farmland Partners, was a shareholder of Farmland Partners at the time of the wrongdoing alleged herein and has been a shareholder of Farmland Partners continuously since that time.

143.   Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights.

144.   Farmland Partners is named as a nominal defendant in this case solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.   Prosecution of this action, independent of the current Board of Directors, is in the best interests of the Company.

145.    The wrongful acts complained of herein subject, and will continue to subject, Farmland Partners to continuing harm because the adverse consequences of the actions are still in effect and ongoing.

146.    The wrongful acts complained of herein were unlawfully concealed from Farmland Partners shareholders.

147.    Farmland Partners' Current Board consists of the following five (5) individuals: Defendants Pittman, Bartels, Downey, Glauber, and Good.  At least a majority of the Board is incapable of disinterestedly and independently considering a demand to commence and vigorously prosecute this action for the reasons set forth below.

148.    As a result of the facts set forth herein, Plaintiff has not made any demand on the Current Director Defendants to institute this action since demand would be a futile and useless act because the Current Director Defendants are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.  The wrongful acts complained of herein show multiple breaches by the Current Director Defendants of their fiduciary duties of loyalty, due care, candor and oversight.

149.    All of the Current Director Defendants are disqualified from fairly evaluating the derivative claims because they are responsible for damages suffered by Farmland Partners.

150.    The Current Director Defendants either issued or permitted the Company to issue materially false and misleading statements about the effectiveness of Farmland Partners' internal controls and violated the Company's Code and multiple corporate governance principles, thus representing evidence of the Individual Defendants' breaches of fiduciary duties.

151.     Demand upon the Current Director Defendants is futile because a majority of the

Board is already predisposed to refuse a demand as demonstrated by the Current Director

Defendants' position on the merits of the *Rota Fortunae* Report, whose allegations also form the

basis, in part, of the liability of the Current Director Defendants in the Securities Class Actions

and the instant litigation.  In the Company's 3Q 2018 10-Q, the Company stated the following, in

relevant part:

> On July 11, 2018, a purported class action lawsuit, captioned *Kachmar v. Farmland Partners, Inc.* (the *Kachmar* Action"), was filed in the United States District Court for the District of Colorado against the Company and certain of our officers by a purported Company stockholder. The complaint alleges, among other things, that our disclosure related to the FPI Loan Program was materially false and misleading in violation of the Securities Exchange Act of 1934, as amended, and Rule 10b-5 promulgated thereunder. On August 17, 2018, a second purported class action, captioned *Mariconda v. Farmland Partners Inc.* (the "*Mariconda* Action") was filed in the United States District Court for the District of Colorado, alleging substantially identical claims as the *Kachmar* Action. Plaintiffs in both actions have moved to consolidate the *Kachmar* Action and the *Mariconda* Action. Those motions are pending and the Company will not be required to respond to either complaint until those motions are decided. At this time, no class has been certified in either the *Kachmar* Action or the *Mariconda* Action and we do not know the amount of damages or other remedies being sought by the plaintiffs. The Company can provide no assurances as to the outcome of this litigation or provide an estimate of related expenses at this time.
>
> On July 24, 2018, we filed a lawsuit in the District Court, Denver County, Colorado, against "Rota Fortunae" (a pseudonym) and numerous co-conspirators (collectively, "Wheel of Fortune") in response to ***an article posted on Seeking Alpha that makes numerous allegations about the Company that we believe to be false or materially misleading***. We believe that as a consequence of Wheel of Fortune's internet posting and related postings on social media, the trading price of our common stock declined by approximately 40%. We believe that Wheel of Fortune's internet posting was made in connection with a "short and distort" scheme to profit from a decline in our stock price based on false and misleading information. ***The lawsuit that we filed alleges that Wheel of Fortune disseminated material false, misleading and defamatory information about us that has harmed us and our stockholders.*** The Company believes that costs associated with the Rota Fortunae litigation in excess of $0.35 million will be covered by insurance. However, because the Company's insurance company has not provided a response

to the Company's claim for defense costs incurred to date, the Company has not recognized any receivable for insurance recoveries which the Company believes it will be entitled to on completion of the claim review process at a future date.

(Emphasis added).

152.     On July 11, 2018, the Company issued a press release calling the allegations that the Company failed to meet its responsibility of full and fair disclosure and intentionally misled investors with its financial reporting false.  On July 17, 2018, the Company issued a more detailed press release stating that the *Rota Fortunae* Report, "intentionally misled the market with sweeping, unfounded assumptions, misleading facts and suggestive language."  On July 24, 2018, the Company issued a press release announcing the filing of the lawsuit against *Rota Fortunae*.

153.     The Current Director Defendants have already determined that they believe that the allegations in the *Rota Fortunae* Report, and consequently the Securities Class Actions, are false. Thus, the Current Director Defendants are incapable of making an independent and disinterested decision to institute and vigorously prosecute this derivative action. Even more important is the reaction of the Current Director Defendants to the *Rota Fortunae* Report.

154.     Demand upon the Audit Committee Defendants (Downey, Bartels and Glauber) would be futile.  Pursuant to the Audit Committee Charter, the Audit Committee members are tasked with oversight responsibilities relating to the Company's accounting and financial reporting process and the audits of the Company's financial statements.  The Audit Committee Defendants failed to adequately perform their oversight responsibilities as required by the Audit Committee Charter.  As a result, the Audit Committee Defendants face a substantial likelihood of liability for their breach of fiduciary duties.

155.    Farmland Partners has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Board has not filed any lawsuits against themselves to attempt to recover for the Company any part of the damages that the Company suffered and will continue to suffer thereby.  Thus, any demand upon the Board would be futile.

156.    The Current Director Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds.  If there is a directors' and officers' liability insurance policy covering the Current Director Defendants, it may contain a provision that eliminates coverage for any action brought directly by the Company against the Current Director Defendants, known as the "insured-versus-insured exclusion."  As a result, if the Board were to sue themselves or certain of the officers of the Company, there would be no directors' and officers' insurance protection.  Accordingly, the Current Director Defendants cannot be expected to bring such a suit.  Alternatively, if the suit is brought derivatively, such an insurance policy will provide a basis for the Company to effectuate a recovery.

157.    If there is no directors' and officers' liability insurance, the Current Director Defendants will not instruct Farmland Partners to sue the Individual Defendants, including themselves, because they would face a large uninsured individual liability if they did. Consequently, demand would also be futile.

158.    **Defendant Pittman** cannot disinterestedly and independently consider a demand. Pittman is the Company's founder, CEO and a director.   Pittman receives lavish compensation from the Company as detailed above.  Pittman, as a member of senior management and a

significant shareholder, is not an independent director due to his insider status.  Pittman is also a named defendant in the *Mariconda* Action.  As conceded in Farmland Partners' public filings, including the Company's 2018 Proxy Statement, Pittman lacks independence.  In his capacity as CEO and executive chairman, Pittman signed all of the Company's Form 10-Ks and 10-Qs filed with the SEC.

159.    **Defendant Bartels** cannot disinterestedly and independently consider a demand. Bartels has served as a director since the Company's IPO on April 16, 2014 and he has been compensated with lucrative director fees during that time.  In his capacity as a director, Bartels signed the Company's allegedly false and misleading 2017 10-K, 2016 10-K and 2015 10-K.

160.    **Defendant Glauber** cannot disinterestedly and independently consider a demand. Glauber has served as a director since February 2015 and he has been compensated with lucrative director fees during that time.  In his capacity as a director, Glauber signed the Company's allegedly false and misleading 2017 10-K, 2016 10-K and 2015 10-K.

161.    **Defendant Downey** cannot disinterestedly and independently consider a demand. Downey has served as a director since the Company's IPO and he has been compensated with lucrative director fees during that time.  In his capacity as a director, Downey signed the Company's allegedly false and misleading 2017 10-K, 2016 10-K and 2015 10-K.

162.    **Defendant Good** cannot disinterestedly and independently consider a demand.  In his capacity as a director, Good signed the Company's allegedly false and misleading 2017 10-K.

163.    Thus, for all of the reasons set forth above, all of the Current Director Defendants cannot consider a demand with independence and disinterestedness.  Consequently, a demand upon the Board is excused as futile.

## CAUSES OF ACTION

## COUNT I

**(Against the Individual Defendants for Breach of Fiduciary Duty)**

164.   Plaintiff incorporates by reference and realleges each of the foregoing paragraphs as though fully set forth herein.

165.   The Individual Defendants owed and owe Farmland Partners fiduciary obligations, including the obligations of good faith, fair dealing, loyalty and care.  Among other things, the Individual Defendants owed a fiduciary duty to Farmland Partners to disseminate truthful, accurate and complete information to shareholders.

166.   The Individual Defendants breached their duties of loyalty, care and good faith by: (i) allowing for materially inadequate controls over the Company's policies and practices with respect to reporting and disclosure; (ii) allowing the Company to file false and misleading periodic reports and other filings with the SEC; (iii) allowing the Company to fail to disclose pertinent, material, and important information in a timely manner; (iv) failing to take appropriate remedial action when the Board knew, or should have known, that the Company was entering into non-arm's-length loans; (v) mismanaging corporate assets by providing loans to Niebur who subsequently filed for bankruptcy; (vi) mismanaging corporate assets by bringing a lawsuit in response to the *Rota Fortunae* Report; (vii) managing the Company in a manner not aligned with shareholders' interests; and (viii) causing substantial damage to the Company's credibility, corporate image, and goodwill.

167.   The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public

statements and representations.  The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts even though such facts were available to them.  Such material misrepresentations and omissions were committed knowingly or recklessly.

168.    The Individual Defendants had actual or constructive knowledge that the Company was engaging in the practices as set forth herein, and that internal controls were not adequately maintained.

169.    As a direct and proximate result of the breaches of fiduciary obligations by the Individual Defendants, Farmland Partners has sustained and continues to sustain significant damages, as alleged herein.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

170.    The Individual Defendants' misconduct – through both their actions and conscious inaction – cannot be exculpated under applicable law as it implicated bad faith and a breach of the duty of loyalty.

171.    Plaintiff, on behalf of Farmland Partners, has no adequate remedy at law.

## COUNT II

### (Against the Individual Defendants for Unjust Enrichment)

172.    Plaintiff incorporates by reference and realleges each of the foregoing paragraphs as though fully set forth herein.

173.    Through the wrongful course of conduct and actions complained of herein, the Individual Defendants were unjustly enriched at the expense of, and to the detriment to,

Farmland Partners.  The wrongful conduct was continuous and resulted in ongoing harm to the Company.  The Individual Defendants were unjustly enriched pursuant to receiving compensation and director remuneration.

174.   Plaintiff, as a shareholder of Farmland Partners, seek restitution from the Individual Defendants, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by the Individual Defendants from their wrongful course of conduct and fiduciary breaches.

175.   By reason of the foregoing, Farmland Partners has sustained and continues to sustain damages.

176.   Plaintiff, on behalf of Farmland Partners, has no adequate remedy at law.

## COUNT III

**(Against the Individual Defendants for Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5)**

177.   Plaintiff incorporates by reference and realleges each of the foregoing paragraphs as though fully set forth herein.

178.   During the Securities Class Action class period of March 16, 2016 to July 10, 2018, the Individual Defendants disseminated or approved the false statements and misrepresentations specified above.

179.   As a result of the foregoing, the market price of the Company's securities was artificially inflated during the Securities Class Action class period of March 16, 2016 to July 10, 2018.  During the Securities Class Action class period of March 16, 2016 to July 10, 2018, the Company performed common stock buybacks as described above, whereby the Company repurchased its outstanding common stock at prices that were artificially inflated.

180.     As a result of the wrongful conduct alleged herein, the Company suffered damages.

181.     By reason of the foregoing, the Individual Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.     Determining that this action is a proper derivative action maintainable under the law and demand was excused;

B.     Directing Individual Defendants to account to Farmland Partners for all damages sustained  or to be sustained by the Company by reason of the wrongs alleged herein;

C.     Directing Farmland Partners to take all necessary actions to reform its corporate governance  and internal procedures to comply with applicable laws and protect the Company and its shareholders from a recurrence of the events described herein, including, but not limited to, a shareholder vote for amendments to Farmland Partners' By-Laws or Articles of Incorporation, appointing or creating a Board-level committee and executive officer position charged with oversight, and taking such other action as may be necessary to place before shareholders for a vote on corporate governance  policies;

D.     Awarding to Farmland Partners restitution from Individual Defendants and ordering disgorgement of all profits, benefits and other compensation obtained by the Individual Defendants;

E.     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees and expenses; and

F.     Granting such other and further relief as the Court may deem just and proper.

## **JURY DEMAND**

Plaintiff demands a trial by jury.


DATED: May 14, 2019

<div style="margin-left:40%">

*/s/ Stuart J. Guber*
Stuart J. Guber
**FARUQI & FARUQI, LLP**
Alex B. Heller
1617 John F. Kennedy Boulevard,
Suite 1550
Philadelphia, PA, 19103
Telephone: 215-277-5770
Facsimile:  215-277-5771
sguber@faruqilaw.com
aheller@faruqilaw.com

*Attorneys for Plaintiff*

</div>

## VERIFICATION OF DERIVATIVE COMPLAINT

I, Jack Winter, hereby verify that I am a shareholder of Farmland Partners Inc. (the "Company"), and am ready, willing, and able to pursue this action in the hope of improving the Company and recovering damages for the Company caused by the defendants' conduct. I have reviewed the allegations in this Verified Shareholder Derivative Complaint ("Complaint") and to those allegations of which I have personal knowledge I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true. Having received a copy of this Complaint, having reviewed it with my counsel, I hereby authorize its filing.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on May 6, 2019

_____
Jack Winter